## IN UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **LA RUFUS MITCHELL,**<br>**2600 Crystal Drive, Apt. 1312**<br>**Arlington, VA 22202**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**JOHN KERRY, SECRETARY,**<br>**UNITED STATES DEPARTMENT OF STATE,**<br>**2201 C Street NW**<br>**Washington, DC 20520,**<br><br>**Defendant,**<br><br>**Serve:**<br><br>**UNITED STATES ATTORNEY'S OFFICE**<br>**FOR THE DISTRICT OF COLUMBIA,**<br>**Attn: Civil Process Clerk**<br>**United States Attorney's Office**<br>**555 4th Street, NW**<br>**Washington, DC 20530,**<br>*-Via Certified Mail*<br><br>**UNITED STATES ATTORNEY GENERAL,**<br>**10th & Pennsylvania Avenue, NW**<br>**Washington, DC 20530,**<br>*-Via Certified Mail*<br><br>**JOHN KERRY, SECRETARY,**<br>**UNITED STATES DEPARTMENT OF STATE**<br>**2201 C Street NW**<br>**Washington, DC 20520,**<br>*-Via Certified Mail* | **Case No. _____** |

## CIVIL COMPLAINT FOR EQUITABLE
## <u>AND MONETARY RELIEF AND DEMAND FOR TRIAL</u>

Plaintiff la Rufus Mitchell ("Mitchell" or "Plaintiff") brings this suit against the United

States Department of State ("Agency"). Plaintiff alleges violations of the Administrative

Procedures Act ("APA"), 5 U.S.C. § 701, *et seq.*, because the Agency and the Foreign Service Grievance Board ("FSGB") undertook actions and rendered decisions that were arbitrary, capricious, and not in accordance with the law.  The Agency and the FSGB abused their discretion rendering their decisions to terminate Ms. Mitchell.  Plaintiff further alleges violations of the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq.*, and Americans with Disabilities Act ("ADA") of 1990, as amended by the ADA Amendments Act ("ADAAA") of 2008, 42 U.S.C. § 12101, *et seq.*, because the Agency failed to accommodate Plaintiff's disabilities and terminated her employment as a result.

## PARTIES

1.	Plaintiff la Rufus Mitchell is an African American woman who resides in Arlington, Virginia.

2.	In mid to late October of 2012, Plaintiff applied to the Department of State as a Foreign Service Officer.  Plaintiff entered the Basic Special Agent Course ("BSAC") as a Diplomatic Security Special Agent Candidate with the Agency on or about January 27, 2013.

3.	Defendant, the U.S. Department of State, is a federal executive agency headquartered in the District of Columbia.

## JURISDICTION

4.	Plaintiff filed a grievance related to her termination from the Agency on October 4, 2013.

5.	After the Agency denied Plaintiff's grievance on January 23, 2014, Plaintiff filed an appeal with the FSGB.

6.	The FSGB issued a Decision on August 5, 2015, and an Amended Decision on August 27, 2015.

7.      This Honorable Court has jurisdiction over the subject matter of this complaint pursuant to 22 U.S.C. § 4140(a), which authorizes an aggrieved party to obtain judicial review of FSGB decision in a United States district court.

8.      Furthermore, this Honorable Court has jurisdiction over the subject matter of this complaint pursuant to 22 U.S.C. § 4140(b), which authorizes an aggrieved party to obtain *de novo* judicial review of FSGB decision in a United States district court as it relates to an allegation of discrimination prohibited by 29 U.S.C. § 791.  See also 22 U.S.C. § 4131(a)(1)(H)(iii).

9.      This court has personal jurisdiction over the Defendant because the U.S. Department of State is located in Washington, DC, and thus Defendant has substantial contacts with and conducts business in the District of Columbia.

10.      Venue is proper in this Court pursuant to 28 U.S. C. § 1391(b) because all actions that form the basis of this Complaint occurred within the judicial district; it is also the judicial district in which Defendant maintained and administered the records relevant to Plaintiff's claims.

## FACTUAL ALLEGATIONS

### Ms. Mitchell's Basic Special Agent Training

11.      Ms. Mitchell entered the Basic Special Agent Course ("BSAC") with the Department on or about January 27, 2013.  She was the only minority candidate and one of only three women in her class, BSAC 123.

12.      After successful completion of the first three training stages, Ms. Mitchell was sent to Federal Law Enforcement Training Center ("FLETC").

13.     During training, Ms. Mitchell experienced hazing, training in adverse harsh weather conditions for asthmatics, and differential treatment by peers and staff.

14.     Peers would exclude Ms. Mitchell from training sessions and study sessions despite Ms. Mitchell's numerous requests to be a part of the groups and the staff encouraging Ms. Mitchell's involvement.

15.     Staff showed differential treatment by not allowing Ms. Mitchell 30 days of training despite the traditional 30 days (or more) given to other trainees to help assist them pass the physical fitness test.

16.     Additionally, staff would remove Ms. Mitchell from class or training to interrogate and question Ms. Mitchell for hearings on false claims against Ms. Mitchell.  All other classmates were questioned after class or training.

17.     Nevertheless, Ms. Mitchell excelled in most areas. She scored high enough to earn an "Academic Award," "Tactical Award," and "Firearms Award."

18.     Ms. Mitchell struggled during some of the physical fitness activities due to her asthma.

19.     Ms. Mitchell provided medical records with her initial application that reflected her history of asthma.  At the time of her application, Ms. Mitchell's physician indicated that her condition was "controlled."

20.     One of the requirements for female trainees ages 30-34, is to complete a 1.5 mile run in less than sixteen minutes and fifteen seconds.

21.     On or about April 7, 2013, Ms. Mitchell's class participated in the "hindered fight" training, which training designed to expose trainees to Oleoresin Capsicum ("OC" or "pepper spray") spray while inducing breathing restrictions through fighting or exercises.

4

22.     The training exercise is divided into seven stages—The Chase, The Confrontation, The Contact, The Cardio-Induced Stage, The Combat, The Control, and The Communication.

23.     During The Chase, the trainee sprints 100 yards while dressed in 33 lbs. of equipment before entering a sandpit maze looking for the "suspect."

24.     In The Confrontation, after finding and confronting the suspect, the trainee runs through the maze coming to the third station—The Contact.

25.     During The Contact, the trainee is taken to the "pepper spray station" where the trainee will be sprayed once for five seconds.

26.     At The Cardio-Induced Stage, the trainee is assigned a cardio regiment.

27.     Subsequently, during The Combat, the trainee must "fight and arrest" the suspect.

28.     After the trainee fights and arrests the "suspect," the trainee calls for their partner and recount the events, called The Communication.

29.     Because pepper spray is a trigger for asthmatics, the trainer asked the trainees if anyone suffered from asthma.  Ms. Mitchell notified the instructor that she had asthma.

30.     The instructor noted Ms. Mitchell's disability but took no alternative actions.

31.     During the course, Ms. Mitchell was sprayed twice with OC spray, which was more than the single dose required to complete the course, before successfully completing the training exercise.

32.     Ms. Mitchell took her inhaler several times throughout the day after the training exercise.  Progressively her asthma grew worse.

**Ms. Mitchell Goes to the Emergency Room**

33.     On or about April 7, 2013, Ms. Mitchell reported to the Brunswick Emergency

Room ("ER") after suffering an asthma attack induced by that day's training exercises.

34.     The ER physician who treated Ms. Mitchell instructed Agency staff to keep Ms. Mitchell out of training the next day due to her severe asthma attack.

35.     The Agency Health Unit prepared a memorandum on April 8, 2013, explaining that Ms. Mitchell was not able to participate fully in training.  The memo stated, in part, that "program modifications/restrictions are necessary for subject staff/student."

36.     Following the asthma attack, one of Ms. Mitchell's classmates, Jessica Pierce, submitted a complaint on June 3, 2013, stating the following:

> She [Ms. Mitchell] *was observed using an inhaler, so it is believed that she suffers from asthma.* For example, during a ground fighting class, *Mitchell was unable to participate for approximately 30 minutes due to this condition.* During a use of force lab she had a similar incident and needed approximately 15 minutes to recover. While at FLETC, Ms. *Mitchell even visited the Emergency Room for an unknown respiratory condition.* These incidents were reported to D.S.S. personnel detailed to FLETC.

(emphasis added).

37.     Ms. Pierce submitted this complaint to Special Agent Christian Horvath, who then forwarded the email to Christopher Pryer, BSAC Program Manager.

38.     From there, the email was sent on to Kevin Williams, Training Branch Chief, and Dale McElhatan, Division Chief.

39.     In forwarding the complaint, Mr. Williams wrote that the complaint "will be placed into the SPRC [Student Performance Review Committee] folders although I am not sure hearsay should be brought in as evidence during an SPRC."

### Student Performance Review

40.     A Student Performance Review Committee ("SPRC") reviewed Ms. Mitchell's

performance.  On or about June 10, 2013, the SPRC recommended that Ms. Mitchell be recycled

into the next class, BSAC 124, because she could not complete the requirements for the Physical

Fitness Test ("PFT").

41.      Specifically, Ms. Mitchell was unable to complete the 1.5 mile run in under

sixteen minutes and fifteen seconds, the required time for a Ms. Mitchell's age and gender.

42.      After being recycled, Ms. Mitchell attempted the run again twice under "black

flag conditions."  Ms. Mitchell was unable to complete the runs in the required time.

43.      Black flag conditions according to military standards, which the Diplomatic

Security Service ("DSS") follows, are temperatures 87 degrees or higher, and allows for 15

minute activities prior to a 45 minute rest.  Any longer, makes heat stroke likely with continued

exposure.

44.      Black flag conditions according to the Department of the Navy Commandant of

Midshipmen Instruction ("COMDTMIDNINST") 5090.1C, dated June 28, 2013, are temperature

conditions greater than 88 degrees Fahrenheit.

45.      According to the Department of Navy Medical, activity is restricted.  Outside

activity under black flag conditions are limited to 15 minutes.

46.      Ms. Mitchell's required run time was 16 minutes and 15 seconds.

47.      On or about July 25, 2013, a second SPRC recommended Ms. Mitchell's

dismissal.

48.      On or about August 15, 2013, Robert Barton from the Office of Training and

Performance Support informed Ms. Mitchell of her dismissal from training because she did not

meet the required time on the 1.5 mile run segment of the PFT.

**The 1.5 Mile Run is Not an Essential Function or Valid Qualification Standard**

49.     The Agency has different standards for different age groups and genders to complete the run.

50.     For example, older trainees and female trainees are given more time to complete the course than younger, male trainees.

51.     DSS Agents are not required to run any distance for any amount of time once they complete training and are given their official assignments.

52.     DSS Agents may voluntarily participate in PFT runs after training, but these runs are not timed and many DSS Agents walk the course.

53.     There are no penalties for not participating or for failing to complete the run in a certain time, unlike essential job duties such as firearms qualifications.

54.     The only time DSS Agents are required to run is for the PFT test during their training.

55.     Of the approximately 2,400 DSS Agents that the Department of State employs, a substantial number cannot meet the run time requirement.

56.     In the Agency's own 10-page vacancy announcement for the DSS Agent position, only one of the seven job functions enumerated includes physical demands.

57.     The announcement states "Diplomatic Security Special Agents, depending upon assignment, are responsible for Department of State security policies, provision of a range of security services, management of security operations, supervision of subordinate staff, and the actual performance of some, or all, of the [above] functions…"

## Ms. Mitchell Requests Alternatives

58.     On September 20, 2013, Ms. Mitchell sent a letter to Deputy Assistant Secretary Bernicat, requesting continued employment within the Agency in a division that could use her skill set.

59.     In a memorandum dated September 18, 2013, and signed September 20, 2013, Gregory B. Starr, head of the DSS, terminated Ms. Mitchell's employment with the Agency, alleging that Ms. Mitchell was "unable to meet the basic conditions of employment."  A following letter indicated that Ms. Mitchell's effective termination date would be October 4, 2013.

60.     On September 27, 2013, Ms. Mitchell sent a letter appealing to Director General Hans Klemm.

61.     Ms. Mitchell stated her belief that run times for asthmatics had been waived in the past, and she asked that the same waiver be extended to her based on her asthma.

62.     In the alternate, Ms. Mitchell asked the Director General Hans Klem to waive the run time requirement as an accommodation for her disability.

63.     Ms. Mitchell continued that the Special Agent position would not require the run aspect as a physical requirement because the run requirement is only ever administered once, upon completion of training, and never again.

64.     Ms. Mitchell added that there had been marked improvement in all measured categories, including the run time.

65.     Finally, Ms. Mitchell pleaded that even if the Agency saw fit to keep her from becoming a Special Agent, she should be allowed to remain in the Logistic Services division to complete the current project to which she was assigned.

66.     Ms. Mitchell's assigned Career Development Officer ("CDO"), Mike Kearns, encouraged her and agreed that she was fit for other positions within the DSS.

67.     Ms. Mitchell reached out to her Senior Special Agent Supervisor, Christian Pryor; GS DS/EX/MGT Director, Jackee Schools; DS/HRM Director, T.J. Shelton; and Director General Hans Klem for assistance.

68.     The Director General denied Ms. Mitchell's request and upheld the recommendation of Diplomatic Security calling for Ms. Mitchell's removal.

## Procedural history

69.     On or about October 4, 2013, Ms. Mitchell submitted her initial grievance of her removal.   The Agency tabled the decision on Ms. Mitchell's accompanying request for interim relief, and this automatically put Ms. Mitchell into an interim position.

70.     The Agency issued its decision on Ms. Mitchell's grievance on or about January 23, 2104.  In denying the grievance, the decision states in part:

> You [Ms. Mitchell] have not provided me with any information
> that supports your request to provide you with a reasonable
> accommodation by waiving your successful completion of the time
> standard for the 1.5 mile run of the BSAC Physical Fitness Test.
> You have not provided evidence that the successful completion of
> the time standard of the 1.5 mile run is not an essential requirement
> of the position nor have you provided evidence that the
> Department has waived this portion of the BSAC for other Special
> Agent Candidates. You also have not provided medical evidence
> that you suffer from asthma.

71.     Ms. Mitchell filed her grievance appeal with the FSGB on or about January 31, 2014.  Ms. Mitchell alleged, *inter alia*, discrimination under the Rehabilitation Act and ADA for the Agency's failure to accommodate her asthma.

72.     After discovery, Ms. Mitchell filed her Supplemental Statement to the FSGB on or about February 5, 2015.

73.     On or about April 15, 2015, the Agency filed its Response to Ms. Mitchell's Supplemental Statement.

74.     On or about April 29, 2015, the Agency terminated Ms. Mitchell from her interim position.  The Agency secured a contractor position with MSDS Consulting Services, LLC, performing substantially the same work as when Ms. Mitchell was as a civilian employee of the Agency.

75.     Ms. Mitchell filed her Rebuttal to the Agency Response on or about April 30, 2015.

76.     The FSGB closed the record on or about June 15, 2015.

77.     On or about August 5, 2015, the FSGB entered its Decision upholding Ms. Mitchell's termination.

78.     The FSGB amended the decision on August 27, 2015.

79.     In its decision, the FSGB cited that a 2001 Health Metrics study ("HMS") the Agency submitted endorsed that "a timed 1.5 mi run [was] a 'predictive indicator for the DS Special Agent selection/qualification'" and that "running was identified as an essential function…common to all law enforcement."

80.     The HMS the Agency attached to its April 15, 2015, response to Ms. Mitchell's Supplemental Statement does not specifically state or sufficiently imply that a timed 1.5 mi run was a "predictive indicator for the DS Special Agent selection/qualification."

81.     The HMS the Agency attached to its April 15, 2015, response to Ms. Mitchell's Supplemental Statement does not specifically state or sufficiently imply that running was as an essential function common to all law enforcement.

82.     In its decision, the FSGB was citing to the Agency's narrative argument in its April 15, 2015, response to Ms. Mitchell's Supplemental Statement, not to the HMS.

83.     In its April 15, 2015, response to Ms. Mitchell's Supplemental Statement, the Agency misinterpreted the HMS by referring to findings the study does not make. The Agency also misquoted an email from non-expert Agency contractor in its response brief.

## COUNT I

### Administrative Procedures Act ("APA")
### 5 U.S.C. § 701, *et seq.*

84.     Plaintiff hereby incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

85.     The Administrative Procedure Act empowers this Honorable Court to hold unlawful and set aside agency actions, findings, and conclusions found to be: (a) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (b) contrary to constitutional right, power, privilege, or immunity; (c) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (d) or without observance of procedure required by law.  *See* 5 U.S.C. §706(2).

86.     In making the foregoing determinations, the Court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error. *See* 5 U.S.C. §706.

87.     The Agency, as well as the FSGB, committed and undertook actions that were arbitrary, capricious, not in accordance with the law, and they abused their discretion.

88.     At all times relevant, the Agency was aware that Ms. Mitchell had asthma, that Ms. Mitchell's asthma became so severe she went to the Emergency Room after an attack, and that she had to use her inhaler with some frequency.

89.     Under the ADA and ADAAA, and as applied by the Rehabilitation Act, a qualified individual is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

90.     The definition of "disability" shall be construed in favor of broad coverage of individuals. *See* 42 U.S.C. § 12102(4)(A).

91.     An "impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." 29 C.F.R. § 1630.2(j)(1)(ii).

92.     The Agency's finding that Ms. Mitchell was not a qualified individual with a disability ignored the above standards and was not in accordance with ADA, ADAAA and Rehabilitation Act.  The Agency applied outdated, pre-ADAAA standards in evaluating Ms. Mitchell's disability status.  The Agency applied a blanket ban, which is an outdated, pre-ADAAA standard in evaluating Ms. Mitchell's disability status.

93.     The Agency's argument that running was an essential job function was not supported by the record.

94.     Similarly, the record does not support the Agency's assertion that completion of the timed run is a business necessity.

95.     The business necessity defense applies to standards that are uniformly applied. *See* 42 U.S.C. §§ 12112(b)(6) and 12113(a); 29 C.F.R. § 1630.10.

96.     By the Agency's own admission, persons that do not pass the PFT may be separated from the Department of State.  Decisions, as to separation, are left to the SPRC and the Candidate's performance file.

97.     The FSGB's reliance on the Agency's assertions on the essential nature of timed runs was arbitrary and capricious.

98.     The FSGB's reliance on the Agency's assertions without reviewing the provided evidence itself was arbitrary and capricious.

99.     Because the Agency cannot maintain that the run time require is essential, it is required by law to accommodate Ms. Mitchell by modifying or adjusting to the job application process to enable:

> [A] qualified applicant with a disability to be considered for the position such qualified applicant desires; or modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position…

29 C.F.R. § 1630.2(o)(1)(i)-(ii)

100.    The Agency's failure to accommodate Ms. Mitchell is contrary to the letter and spirit of the ADA, ADAAA, and Rehabilitation Act.

101.    The Agency was also required to engage in the interactive process. Its decision to ignore this requirement was arbitrary and capricious and a failure to properly apply the law.

102.    The FSGB's failure to correct the Agency decision is a misapplication of the law.

103.    As a result of the Agency's actions, Ms. Mitchell has suffered and continues to suffer actual adverse and harmful effects and injuries.

104.     Thus, John Kerry, in his capacity as Secretary of State is liable under the APA for agency action, findings, and conclusions that were arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

## COUNT II

**Rehabilitation Act**
**29 U.S.C. § 701, *et seq.***
**Americans with Disabilities Act**
**42 U.S.C. § 12101, *et seq.***

105.     Plaintiff hereby incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

106.     The Rehabilitation Act prohibits federal agencies from discriminating against employees on the basis of disability.

107.     The ADA defines "disability" as "a physical or mental impairment that constitutes or results in a substantial impediment to employment," or "a physical or mental impairment that substantially limits one or more major life activities of such individual."

108.     The ADA defines a qualified individual as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

109.     The definition of "disability" shall be construed in favor of broad coverage of individuals. *See* 42 U.S.C. § 12102(4)(A).

110.     An "impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." 29 C.F.R. § 1630.2(j)(1)(ii).

111.    At all times relevant, the Agency was aware that Ms. Mitchell had asthma, that Ms. Mitchell's asthma became so severe she went to the Emergency Room after an attack, and that she had to use her inhaler with some frequency.

112.    The Agency terminated Ms. Mitchell's employment because of her disability.

113.    The Agency disparately treated Ms. Mitchell because of her disability when it terminated her employment.

114.    The Agency's actions with regard to the PFT disparately impact individuals with asthma and breathing disabilities, including Ms. Mitchell.

115.    The Agency's failure to accommodate Ms. Mitchell is contrary to the letter and spirit of the ADA, ADAAA, and Rehabilitation Act.

116.    Because the Agency cannot maintain that the run time require is essential, it is required by law to accommodate Ms. Mitchell by modifying or adjusting to the job application process to enable:

> [A] qualified applicant with a disability to be considered for the
> position such qualified applicant desires; or modifications or
> adjustments to the work environment, or to the manner or
> circumstances under which the position held or desired is
> customarily performed, that enable an individual with a disability
> who is qualified to perform the essential functions of that
> position...

29 C.F.R. § 1630.2(o)(1)(i)-(ii)

117.    The Agency was also required to engage in the interactive process. Its decision to ignore this requirement was a failure to properly apply the law.

## PRAYER FOR RELIEF

Based on the foregoing, Ms. Mitchell respectfully requests that she be awarded the following relief against the Agency:

a.    Reverse the decision of the FSGB;

b.    Reinstatement to the DSS or similar position within the Department of State;

c.    Backpay;

d.    Reasonable costs and experts' and attorneys' fees;

e.    Compensatory damages; and

f.    Any other such relief that the Court may deem just and equitable.


Dated:  October 30, 2015                         Respectfully submitted,



R. Scott Oswald, D.C. Bar No. 458859
The Employment Law Group, P.C.
888 17th Street, N.W., 9th floor
Washington, D.C. 20006
(202) 331-3911
(202) 261-2835 (facsimile)
soswald@employmentlawgroup.com
mvogelsang@employmentlawgroup.com
*Counsel for Plaintiff*