# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| LA RUFUS MITCHELL,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL POMPEO, *United States Secretary of State,*<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    No. 1:15-cv-1849 (KBJ) |

## <u>MEMORANDUM OPINION</u>

When la' Rufus Mitchell failed to complete a 1.5-mile-run training requirement for the sixth time, the United States Department of State ("State" or "Defendant") terminated Mitchell from her status as a Special Agent candidate for the Bureau of Diplomatic Security. Mitchell is asthmatic, and in the instant lawsuit, she maintains that State unlawfully refused to accommodate her disability, in violation of the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*, and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* (*See* Compl., ECF No. 1, ¶¶ 105–117.) Before this Court at present are State's motion for summary judgment and Mitchell's cross-motion for summary judgment. (*See* Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 58); Pl.'s Cross-Mot. for Summ. J. & Opp'n to Def.'s Mot. ("Pl.'s Cross-Mot."), ECF No. 60). State argues that Mitchell's request for waiver of the 1.5-mile run requirement was not a reasonable accommodation, because "it would have eliminated an essential function of the Special Agent job: physical fitness." (Mem. in Supp. of Def.'s

Mot. ("Def.'s Mem."), ECF No. 58-1, at 14.)[1]  Mitchell asserts that waiver of the run requirement was but one of "nine different accommodation requests" that she made to various State officials, each of which was directly or constructively denied.  (Pl.'s Mem. in Supp. of Pl.'s Cross-Mot. ("Pl.'s Mem."), ECF No. 60-8, at 6.)  Mitchell further contends that State not only failed to accommodate her disability with respect to the run requirement (*see id.* at 19), but also refused to "engage in a meaningful dialogue, in good faith, to discuss alternative reasonable accommodations" (*id.* at 21).

For the reasons explained below, this Court concludes that Mitchell has not presented any evidence from which a reasonable jury could infer that Mitchell could have performed the essential functions of the Special Agent position even with accommodation, but that the record evidence does give rise to a genuine issue of fact regarding whether or not *another* position existed within State that Mitchell could have performed.  Consequently, neither State nor Mitchell is entitled to judgment as a matter of law, and both parties' cross-motions for summary judgment must be **DENIED**.

## I.    BACKGROUND

### A.    Basic Facts[2]

Mitchell began her employment with State in January of 2013.  (*See* Ex. 1 to Pl.'s Cross-Mot., ECF No. 60-1, at 7; *see also* Pl.'s Mem. at 8; Def.'s Mem. at 9.)  There are many "Civil Service" and "Foreign Service" employment positions within State, and the positions are divided between numerous bureaus and offices.[3]  State

---

[1] Page-number citations to the documents that the parties have filed refer to the page numbers that the Court's electronic filing system automatically assigns.

[2] The basic facts recited herein have generally been drawn from the parties' briefs and exhibits, and are undisputed unless otherwise noted.

[3] *See Department Organization*, U.S. Dep't of State, https://www.state.gov/r/pa/ei/rls/dos/436.htm.  This

insists that "Mitchell applied to be a Special Agent[,]" (Def.'s Mem. at 6) and that she "was hired as a Special Agent candidate" (*id.* at 9), while Mitchell claims she that was hired "as a Foreign Service Officer and placed into the special agent candidacy program[,]" (Pl.'s Mem. at 7). Mitchell asserts, in particular, that after State hired her as a Foreign Service Officer, she was *assigned* to the Bureau of Diplomatic Security[,]" and that the Bureau of Diplomatic Security comprises "nearly 34,000 employees[,]" of which "2400 are Special Agents[.]" (*Id.* at 5 (emphasis added) (footnotes omitted).) Mitchell maintains that the Diplomatic Security Services division of the Bureau of Diplomatic Security "consists of special agents, security engineering officers, security technical specialists, diplomatic couriers, support personnel, and numerous other security professionals." (*Id.* at 6 (footnote omitted).)

In support of her assertion that she was hired "as a Foreign Service Officer" (*id.* at 5), Mitchell has attached to her cross-motion various "Agency Hiring Letters" and related records (*id.* at 5 n.1; *see also* Ex. 1 to Pl.'s Cross-Mot.). One of these attachments confirms that various "Foreign Service Specialist jobs" exist within State, including the position of "Special Agent" (Ex. 1. to Pl.'s Cross-Mot. at 17, 20; *see also id.* at 17–20 (providing "Brief Position Descriptions" for "Foreign Service Specialist jobs"), while another suggests broadly that Mitchell's appointment was as "a Foreign Service Specialist" (*id.* at 2 (letter of May 25, 2011, from the Staff Director of the Board of Examiners for the Foreign Service to Mitchell, stating that "I am pleased to

---

Court takes judicial notice of this information "due to the fact that the document is located on the website" of the United States Department of State and is thus "'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned[.]'" *Hamilton v. Paulson*, 542 F. Supp. 2d 37, 52 n.15 (quoting Fed. R. Evid. 201(b)), *rev'd on other grounds sub nom. Hamilton v. Geithner*, 666 F.3d 1344 (D.C. Cir. 2012).

extend to you a Conditional Offer of appointment as a Foreign Service Specialist Career Candidate").) However, other correspondence plainly indicates that Mitchell was hired specifically as a "Special Agent" candidate. (*See id.* at 7 (correspondence from a Human Resources Specialist at the Registrar Office of the Bureau of Human Resources to Mitchell, stating that "[t]he Registrar's Office is pleased to extend an appointment offer for the January 28, 2013—Diplomatic Security Special Agent Class." (emphasis omitted)); *id.* at 11 (letter of December 27, 2012, from a Human Resources Specialist at the Office of Recruitment, Examination and Employment to Mitchell, stating that "[b]y this letter, the Registrar of the Board of Examiners confirms to you an offer of appointment as an untenured Diplomatic Security Special Agent Career Candidate" (emphasis omitted)); *see also* Ex. 6 to Pl.'s Cross-Mot., ECF No. 60-1, at 37 (Foreign Service Grievance Board decision describing Mitchell as "an untenured FS-06 Diplomatic Security (DS) Special Agent Candidate, at the Department of State").)

There is no dispute that Foreign Service Special Agents "are specially trained Foreign Service security professionals" who are "sworn Federal law enforcement officers." (Ex. 1 to Pl.'s Cross-Mot. at 20; *see also* Ex. 19 to Pl.'s Cross-Mot., ECF No. 60-4, at 2–3 (State Department vacancy announcement, describing "Duties" of Diplomatic Security Special Agents); Def.'s Mem. at 6.) State "requires all Special Agent candidates to pass a physical fitness test to successfully complete training— including push-ups, sit-ups, and a timed 1.5-mile run" (Def.'s Mem. at 5; *see also* Ex. 1 to Bearden Decl., ECF No. 58-3, at 3–13), and Mitchell apparently did quite well during training (*see* Ex. 10 to Pl.'s Cross-Mot., ECF No. 60-2, at 18), with the exception of certain physical fitness tests. In particular, Mitchell failed to meet the minimum time

requirement for her 1.5-mile run, which, for her age and gender, was 16 minutes and 15 seconds.  (*See* Ex. 2 to Coyle Decl., ECF No. 58-4, at 19.)

The first time Mitchell attempted the 1.5-mile run, on February 19, 2013, it took her 22 minutes and 10 seconds to complete the course.  (*See* Ex. 2 to Bearden Decl., ECF No. 58-3, at 28.)  Mitchell attempted the run again on April 23, 2013, this time taking 22 minutes and 38 seconds to finish the task.  (*See* Excerpts from Mitchell Dep., ECF No. 58-9, at 15 (99:9–20).)  On May 17, 2013, Mitchell ran for a third time, taking 20 minutes and 53 seconds to finish.  (*See* Ex. 2 to Bearden Decl. at 28.)  Her fourth attempt took place on May 31, 2013, but she again failed to meet the requirement, finishing in 20 minutes and one second. (*See id.*)  Mitchell alleges that "[e]ach time [she] failed to meet the set time for her age and gender because of her asthma."  (Pl.'s Mem. at 8.)

After Mitchell failed to meet the minimum run-time standard four times, she was "referred to the Student Performance Review Committee for further review and action up to, and including, a recommendation for dismissal from training."  (Ex. 5 to Horvath Decl., ECF No. 58-5, at 18.)  The Committee "considered three options:  [t]hat [Mitchell] continue with [her] class; recycle to another BSAC class; or that [she be] removed from training."  (Ex. 2 to Shelton Decl., ECF No. 58-10, at 36.)  The Committee opted to recommend that Mitchell "be recycled to the next [Special Agent training] class" (*id.*); thus, Mitchell was able to attempt the 1.5-mile-run test for a fifth time on July 9, 2013.  She missed the 16-minute-15-second cut-off on that occasion once again, finishing in 19 minutes and 21 seconds.  (*See* Ex. 2 to Bearden Decl. at 28.)  And Mitchell took the run test one last time—her sixth attempt—one week later, taking

20 minutes and 42 minutes to run the 1.5-mile course. (*See id.*)

Mitchell was referred once more to the Student Performance Review Committee, which this time recommended that she be dismissed from the training program. (*See* Ex. 3 to Shelton Decl., ECF No. 58-10, at 39.) "The committee's recommendation was accepted by the Assistant Director for Training and approved by the Director of the Diplomatic Security Service." (Ex. 7 to Horvath Decl., ECF No. 58-5, at 22.) The Acting Director General of the Foreign Service and Acting Director of Human Resources then approved the recommendation to terminate Mitchell from "appointment to the Foreign Service" on September 20, 2013. (Ex. 1 to Klemm Decl., ECF No. 58-8, at 3.) Mitchell was thus notified that her employment would be terminated "effective October 4, 2013[,] . . . because you are unable to meet the basic conditions of employment." (Ex. 2 to Klemm Decl., ECF No. 58-8, at 6.)

Mitchell asserts that she "struggled during some of the physical fitness [training] due to her asthma[,]" (Pl.'s Mem. at 8), and insists that she had specifically "informed Defendant that she suffered from asthma" before she was hired as a Special Agent candidate (*id.* at 7). State maintains that "[t]he medical records [Mitchell] submitted as part of her application materials said that although she had a history of asthma, her asthma was 'completely controlled' and she had not had any symptoms recently." (Def.'s Mem. at 9; *see also* Ex. 1 to Shelton Decl., ECF No. 58-10, at 11 (showing that Mitchell's doctor circled "completely controlled" when describing Mitchell's "asthma control during the past 4 weeks").) There is no dispute that State knew about Mitchell's asthma before hiring her; that Mitchell had a history of asthma; that Mitchell suffered numerous asthma attacks while attempting to complete her training for the Special

Agent position; and that State was aware that she was suffering from asthma attacks during training. (*See, e.g.*, Ex. 9 to Pl.'s Cross-Mot., ECF No. 60-2, at 8–9, 12.)

It is also undisputed that Mitchell made various requests for accommodation before she was terminated from the program. The record evidence demonstrates that she specifically requested a waiver of the 1.5-mile-run requirement (*see* Ex. 4 to Klemm Decl., ECF No. 58-8, at 10), and that she also sought reassignment to a different position (*see id.* at 11 ("I hope that you will permit me to be an asset to the Department of State either as a [Diplomatic Security] agent or in some other capacity."); Ex. 7 to Pl.'s Cross-Mot. at 44 (email from Mitchell to Tracy Mahaffey explaining that she, Mitchell, had been "placed with the DS/MGT/LS division" after being removed from Special Agent candidacy, and asking, "is it possible that I can remain in the position that I am in for 4-6 months?")). Additionally, Mitchell's supervisors discussed permitting her to carry an inhaler during training (*see, e.g.*, Ex. 3 to Pl.'s Cross-Mot., ECF No. 60-1, at 27), or allowing her to run indoors (*see* Ex. 5 to Pl.'s Cross-Mot, ECF No. 60-1, at 33), or use a treadmill (*see id.*), but it is unclear from the record whether any of these accommodations were ever attempted.

On October 4, 2013, Mitchell filed an administrative grievance, challenging her termination. (*See* Ex. 1 to Shelton Decl. at 27–29.) Her grievance was denied on January 23, 2014. (*See id.* at 30–34.) Mitchell filed an appeal on January 31, 2014 (*see* Ex. R to Pl.'s Opp'n to Def.'s Mot. to Dismiss, ECF No. 15-18, at 2–10), which was denied on August 27, 2015 (*see* Ex. C. to Def.'s Mot. to Dismiss, ECF No. 11-1, at 2, 23).

## B. Procedural History

Mitchell filed the instant lawsuit on October 30, 2015. (*See* Compl., ECF No. 1.)

In her two-count complaint, Mitchell alleged that State's act of terminating her violated the Administrative Procedures Act ("APA"), 5 U.S.C. § 701 *et seq.*, as well as the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*, and the ADA, 42 U.S.C. § 1201 *et seq.* (*See* Compl. ¶¶ 84–104 (Count I)); *id.* at ¶¶ 105–17 (Count II).)  State filed a motion to dismiss (*see* Def.'s Mot. to Dismiss, ECF No. 8), and this Court granted the motion as it pertained to Mitchell's APA claim but denied it as to her Rehabilitation Act and ADA claim (*see* Min. Entry of Mar. 23, 2017; *see also* Hr'g Tr.).  State therefore filed an answer to Mitchell's complaint on April 6, 2017 (*see* Answer, ECF No. 23), and the parties engaged in discovery (*see* Min. Order of Feb. 20, 2018).  Following the close of discovery, State filed a motion for summary judgment (*see* Def.'s Mot.), and Mitchell filed a cross-motion for summary judgment (*see* Pl.'s Cross-Mot.), both of which are now pending.

State argues in its motion for summary judgment that Mitchell was not subject to Rehabilitation Act protections because she could not perform an essential function of the Special Agent position—*i.e.*, physical fitness and running—as demonstrated by her inability to pass the 1.5-mile-run test, and that, therefore, waiving the run altogether was not a reasonable accommodation State was required to make.  (Def.'s Mem. at 15); *see also* 42 U.S.C. § 12112(a) (prohibiting discrimination against "qualified" individuals); 29 C.F.R. § 1630.2(m) (defining "qualified individual").  State also argues that each of Mitchell's other accommodation requests were not administratively exhausted and thus "do not give rise to a viable reasonable accommodation claim[.]" (Mem. in Further Supp. of Def.'s Mot. and in Opp'n to Pl.'s Cross-Mot. ("Def.'s Reply"), ECF No. 65, at 13.)

Mitchell responds in her cross-motion that "[t]he 1.5-mile run is not an essential job element" of the Special Agent position (Pl.'s Mem. at 12), nor of other positions within the Foreign Service. (*See id.* at 15.) Mitchell also argues that Defendant failed to accommodate her disability, and at the very least had an obligation to engage in "an informal, interactive process to identify the appropriate accommodation" once she requested one. (*Id.* at 18; *see also id.* at 21–22.)[4]

## II. APPLICABLE LEGAL STANDARD

### A. Motions For Summary Judgment Under Rule 56

To decide whether either party is entitled to summary judgment, this Court must undertake "the threshold inquiry of determining whether there is a need for trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *see also* Fed. R. Civ. P. 56(c). A party seeking summary judgment bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). Such "evidence is to be viewed in the light most favorable to

---

[4] Mitchell's cross-motion further maintains that the "Agency's motion presents numerous material assertions of fact for which Ms. Mitchell is entitled to discovery[.]" (Pl.'s Mem. at 10 (capitalization altered).) But the discovery period is closed in this matter, and Mitchell's prior motion to compel answers to interrogatories and requests for production (*see* Pl.'s Mot. to Compel, ECF No. 54) was denied (*see* Min. Order of Aug. 27, 2018). Therefore, Mitchell must rely on the closed record to address whether and to what extent there are any genuine issues of material fact that preclude a grant of summary judgment in the agency's favor.

the nonmoving party and the court must draw all reasonable inferences in favor of the nonmoving party." *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011) (citation omitted); *see also Celotex*, 477 U.S. at 330 n.2 ("If . . . there is any evidence in the record from any source from which a reasonable inference in the [nonmoving party's] favor may be drawn, the moving party simply cannot obtain a summary judgment[.]" (internal quotation marks and citation omitted)).  A factual dispute alone is not sufficient to bar summary judgment, *see Liberty Lobby*, 477 U.S. at 255, as the contested fact must be material and the dispute must be genuine, *see* Fed. R. Civ. P. 56(a).  A fact is material only if it "might affect the outcome of the suit under the governing law[.]" *Liberty Lobby*, 477 U.S. at 248.  Likewise, a dispute is genuine only if "the evidence presents a sufficient disagreement to require submission to a jury[.]" *Id.* at 251–52; *see also id.* at 249 ("If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." (internal citations omitted)).

In cases such as this one, where the parties have filed cross-motions for summary judgment, "each [party] must carry its own burden under the applicable legal standard." *Ehrman v. United States*, 429 F. Supp. 2d 61, 67 (D.D.C.2006).  Accordingly, "[c]ross-motions for summary judgment are treated separately[,]" *Act Now to Stop War & End Racism Coal. v. Dist. of Columbia*, 905 F.Supp.2d 317, 327 (D.D.C. 2012), *rev'd on other grounds*, 846 F.3d 391 (D.C. Cir. 2017), such that "[a] cross-motion for summary judgment does not concede the factual assertions of the opposing motion[,]" *CEI Washington Bureau, Inc. v. Dep't of Justice*, 469 F.3d 126, 129 (D.C. Cir. 2006).  Indeed, "'neither party waives the right to a full trial on the merits by filing its own

motion; each side concedes that no material facts are at issue only for the purposes of its own motion.'" *Sherwood v. Wash. Post*, 871 F.2d 1144, 1147 n.4 (D.C. Cir. 1989) (quoting *McKenzie v. Sawyer*, 684 F.2d 62, 68 n.3 (D.C.Cir.1982), *abrogated on other grounds by Berger v. Iron Workers Reinforced Rodmen*, 170 F.3d 1111 (D.C. Cir. 1999)).

### B.     The ADA And The Rehabilitation Act

Mitchell purports to bring her claim under both the ADA and the Rehabilitation Act (*see* Compl. at 15), but the ADA does not, on its own, apply to the federal government.  *See* 42 U.S.C. § 12111(5)(B)(i) ("The term 'employer' does not include[] the United States[.]")  Among its various purposes, Congress enacted the Rehabilitation Act of 1973 to "ensure that the Federal Government plays a leadership role in promoting the employment of individuals with disabilities[.]"  29 U.S.C. § 701(b)(3). Therefore, the Rehabilitation Act prohibits federal employers from "discriminat[ing] against a qualified individual on the basis of disability in regard to . . . the hiring, advancement, or discharge of employees," 42 U.S.C. § 12112(a), and the Rehabilitation Act incorporates the standards from Title I of the ADA, *see* 29 C.F.R. § 1614.203(b) ("The standards used to determine whether Section 501 [of the Rehabilitation Act] has been violated in a complaint alleging employment discrimination under this part shall be the standards applied under the ADA.").  Thus, illegal discrimination in violation of the Rehabilitation Act includes the failure to provide "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability[.]"  42 U.S.C. § 12112(b)(5)(A).

### III.    ANALYSIS

To prevail on a claim that an employer failed to accommodate her disability, in violation of the ADA or Rehabilitation Act, a plaintiff must demonstrate (1) that "she has a disability" as federal law defines that term; (2) that her employer "had notice of the disability"; (3) that she is a "'qualified individual[,]'" (*i.e.*, that she "could perform the essential functions of the position either with reasonable accommodation or without it"); and (4) that her employer "refused to make the accommodation." *Hill v. Assocs. for Renewal in Educ., Inc.*, 897 F.3d 232, 237 (D.C. Cir. 2018) (quoting 42 U.S.C. § 12112(b)(5)(A) and citing *Solomon v. Vilsack*, 763 F.3d 1, 9 (D.C. Cir. 2014)); *see also Barth v. Gelb*, 2 F.3d 1180, 1186 (D.C. Cir. 1993). "The plaintiff bears the burden of proving each element by a preponderance of the evidence[.]" *Von Drasek v. Burwell*, 121 F. Supp. 3d 143, 155 (D.D.C. 2015) (citing *Flemmings v. Howard Univ.*, 198 F.3d 857, 861 (D.C. Cir. 1999)).

In this case, neither party disputes that Mitchell has a disability, that State had notice of her disability, or that State refused to accommodate Mitchell as requested. The parties debate instead whether Mitchell was a "qualified individual[,]" 42 U.S.C. § 12112(b)(5)(A), meaning that she "satisfies the requisite skill, experience, education and other job-related requirements . . . and, with or without reasonable accommodation, can perform the essential functions of such position[,]" 29 C.F.R. § 1630.2(m). As explained below, this Court has concluded that while Mitchell has failed to show that she was qualified for the Special Agent position, she has successfully raised a material question of fact as to whether or not there existed a different position within State that was available and for which she would have been qualified. *See Harris v. Chao*, 257 F. Supp. 3d 67, 76 (D.D.C. 2017) (explaining that "when an accommodation cannot be

made in the employee's current position, the federal employer *must* consider the feasibility of reassigning the disabled employee to a vacant position" (emphasis in original; internal quotation marks and citation omitted)). As such, there is triable issue of fact regarding whether or not Mitchell was a "qualified individual[,]" 42 U.S.C. § 12112(b)(5)(A), such that neither party "is 'entitled to a judgment as a matter of law'" on Mitchell's failure-to-accommodate claim, *Celotex*, 477 U.S. at 323 (quoting what is now Fed. R. Civ. P. 56(a)).

### A. Mitchell Has Not Shown That She Could Perform The Essential Functions of The Special Agent Position, With Or Without Reasonable Accommodation

As explained above, to meet her burden of showing she was a "'qualified individual' entitled to the Rehabilitation Act's protections" at the time of her termination, Mitchell must show by a preponderance of the evidence at trial that she was "able to perform, 'with or without reasonable accommodation,' 'the essential functions of the employment position[.]'" *Solomon*, 763 F.3d at 5 (quoting 42 U.S.C. § 12111(8)); *see also* 29 C.F.R. § 1630.2(m); *Minter v. Dist. of Columbia*, 809 F.3d 66, 70 (D.C. Cir. 2015) ("The plaintiff must establish her ability to perform those [essential] functions (with or without reasonable accommodation) at the time the employer denied her request for accommodation."). "Essential functions" are "the fundamental job duties of the employment position" and do "not include the marginal functions of the position." 29 C.F.R. § 1630.2(n)(1).

Importantly, "[e]vidence of whether a particular function is essential includes, but is not limited to[,]" (1) "the employer's judgment as to which functions are essential"; (2) "[w]ritten job descriptions prepared before advertising or interviewing applicants"; (3) "[t]he consequences of not requiring the incumbent to perform the

function"; and (4) "[t]he work experience of past incumbents in the job[,]" 29 C.F.R. § 1630.2(n)(3); *see also* 42 U.S.C. § 12111(8) (explaining that "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job"). Moreover, "[e]mployers enjoy 'substantial deference' in defining essential functions[.]" *Floyd v. Lee*, 85 F. Supp. 3d 482, 510 (D.D.C. 2015) (quoting *McNair v. Dist. of Columbia*, 11 F.Supp.3d 10, 15 (D.D.C.2014)). And while "courts generally view a dispute over the definition of a job's essential functions as a question of fact that should be resolved by a jury[,]" *Baker v. Potter*, 294 F. Supp. 33, 44 (D.D.C. 2003), if there is no *genuine* dispute as to whether a particular duty is an essential function of the Special Agent position, then this Court may resolve the question at the summary judgment phase, *see* Fed. R. Civ. P. 56(a).

This Court finds that Mitchell has failed to present evidence sufficient to create a triable issue of fact regarding whether she was able to perform an essential function of the Special Agent position—specifically the physical fitness or running requirement—for the reasons explained below.

1.     Physical Fitness (And In Particular, Running) Is An Essential Function Of The Special Agent Position

The Court has examined the evidence each party has submitted and has concluded that physical fitness is an essential function of the Special Agent position at all times relevant to this case.

First, Mitchell does not dispute that her employer, the State Department, has consistently determined that physical fitness is a critical aspect of the successful

Special Agent's training and role. *See* 29 C.F.R. § 1630.2(n)(3)(i). (*See also* Ex. 14 to Pl.'s Cross-Mot., ECF No. 60-2, at 32 (explaining that "[i]t is incumbent upon the trainee to arrive in good physical health and be physically fit"; that "[s]uccessful completion of the [Diplomatic Security] Physical Fitness Test [] is a requirement"; and that "[Diplomatic Security] requires ongoing participation in the Physical Fitness Program throughout an agent's career"); Ex. 15 to Pl.'s Cross-Mot, ECF No. 60-3, at 5 ("Physical fitness participation must be included as a continuing responsibility in an employee's work requirement statement (for Foreign Service special agents/security officers)[.]").) Indeed, the "[w]ritten job descriptions" that were included in the vacancy announcements for the Special Agent position plainly indicate that physical fitness is indispensable. (*See, e.g.*, Ex. 1 to Shelton Decl. at 19 ("Applicants must be fit for strenuous physical exertion and able to pass physical fitness tests."); *id.* ("[F]ailure to pass any aspect of the initial training, including physical fitness tests, is grounds for separation."); *id.* at 20 ("Special Agents must perform duties in the field that are physically demanding. . . . The Special Agent's life, and the lives of others, may depend upon the Agent's physical capabilities and conditioning. For this reason, Special Agent candidates must satisfy . . . physical fitness requirements that are more rigorous than those of most other professions.").) And not only must the agency's "Office of Medical Services" sign off on a Special Agent candidate, by deeming such individual "medically able to meet the numerous, and often arduous, physical demands that are inherent in, and are a necessary part of, the essential functions of the job[,]" (*id.*), but the candidates themselves must affirmatively indicate their assent to the following statement: "I understand that I must successfully undergo a rigorous training program,

which includes . . . physical fitness standards and tests, . . . and that failure to pass *any* aspect of the training program is grounds for separation[,]" (*id.* at 24 (emphasis in original).)

State also offers expert testimony and other extrinsic evidence in support of their argument that physical fitness is an essential requirement for a successful Special Agent.  For example, Dr. Victor Katch opined that "[t]here is scientific consensus that a minimum level of cardio-respiratory and performance fitness (stamina) represents a fundamental and necessary physical attribute (construct) for successful performance and long-term health outcomes for federal, state and local law enforcement agents and first responders, including the U.S. Department of State, Diplomatic Security Service [].” (Ex. 1 to Katch Decl., ECF No. 58-7, at 7.)  And this view appears to be one in which Special Agents themselves agree:  State has offered results from a 2004 report that "survey[ed] Special Agents to determine which physical tasks they have performed on the job" (Def.'s Mem. at 16 (citing Ex. 6 & 7 to Shelton Decl., ECF No. 58-13), and according to the survey results, between 72 and 82 percent of the Special Agents who responded reported that running in some manner, for some amount of time, is "[r]equired by" the Special Agent job.  (*Id.* at 81.)  In addition, between 58 and 73 percent of the survey respondents reported that each of the specified running tasks was at least "[s]omewhat important" to the position.  (*Id.* at 15 (explaining rating system); *see also id.* at 81 (showing ratings).)

State's additional argument that "the consequences of not requiring Special Agent to be physically fit would be dire" (Def.'s Mem. at 17) is also significant, *see* 29 C.F.R. § 1630.2(n)(2)(iv) (explaining that "[t]he consequences of not requiring the

incumbent to perform the function" may be considered in determining whether a job function is essential). There is no dispute that "Special Agents are responsible for protecting[] the Secretary of State, foreign dignitaries, and U.S. diplomatic missions[,]" or that a lack of fitness could "jeopardize the safety" of the people these agents are sworn to protect and defend. (Def.'s Mem. at 17.) Indeed, "[a]s the Third Circuit has recognized, law enforcement officers 'must be ready and able to apprehend not just the numerous sedentary, petty criminals, but also the fleet-footed few who, from time to time, wreak serious harm.'" (*Id.* (quoting *Lanning v. Southeastern Penn. Transp. Auth.*, 308 F.3d 286, 290 (3d Cir. 2002)).)

In sum, State has consistently exercised its judgment to deem physical fitness—and the ability to run in particular—to be an essential requirement for the Special Agent position for which Mitchell trained, and it said as much in the vacancy announcement that issued before Mitchell was hired. Expert opinion supports this view, as do the logical consequences of having unfit agents, given the role that individuals in this position play in safeguarding the security of State Department protectees. The work experience of past Special Agents further underscores the conclusion that physical fitness—and more specifically, being able to run—is an essential function of the Special Agent position.

Importantly, Mitchell offers no evidence to the contrary. Instead, even while asserting that she "is not debating if the run is an essential job element[,]" (Pl.'s Mem. at 12), Mitchell attempts to cast doubt on the law and the facts that State has presented regarding the essential nature of physical fitness as far as the Special Agent position is concerned. For example, Mitchell points out that "[v]arious circuits have determined

physical requirements may incur infrequently but *must* (1) at least exist daily, (2) have detrimental consequences for failing the requirement, and (3) not exist for emergency situations to rise to the level of an essential function." (*Id.* at 12–13 (emphasis added) (citing *EEOC v. E.I. Du Pont de Nemours & Co.*, 480 F.3d 724 (5th Cir. 2007); *Coleman v. Keebler Co.*, 997 F. Supp. 1102, 1115 (N.D. Ind. 1998)).) But the cases Mitchell cites as establishing these requirements are inapposite, as neither involved State Department Special Agents, or even law enforcement officers.

Mitchell's repeated suggestions that State's physical fitness requirement is too *vague* to be deemed essential (*see, e.g.*, Pl.'s Mem. at 13), or that at least one other agency has more specific descriptions of a different physical test (*see id.* n.20), fare no better. Regardless of how this Court interprets State's job descriptions, and no matter how much more detailed the vacancy announcement could have been with respect to *how much* physical fitness the agency would require of Special Agent candidates, it is irrefutable that State made clear to candidates for the Special Agent position that physical fitness was an essential function of the job before they applied or were hired, and Mitchell cannot reasonably contest the fact that State has good reason to require physical fitness of individuals who seek to fulfill the Special Agent role.

With respect to the survey evidence that State has offered, Mitchell asserts that the survey reflects the responses of only 12 percent of the 2,400 Special Agents State employs, and thus State "cannot mathematically prove that the correlation coefficient between arrests and the percentage of running is high with only 12% of the population subjectively saying they run 74% of the time." (Pl.'s Mem. at 14–15 (footnote and citation omitted).) But State has not offered these survey results to prove that running

leads to more *arrests*; indeed, it is not at all clear that making arrests is even part of a Special Agent's duties. (*See* Ex. 1 to Shelton Decl. at 16 ("Major activities [of the Special Agent position] include protective services, management of security programs for Foreign Service posts, criminal investigations, and background investigations, in addition to administrative, training, and liaison functions.").) Rather, State has submitted the survey to demonstrate that physical fitness—and specifically, running—is an essential function of the Special Agent position in the view of 386 of the agents surveyed, and those agents represented approximately 30 percent, rather than 12 percent, of the total number of agents employed at the time. (*See id.* at 19 (providing numbers).) And Mitchell offers nothing that suggests that the survey results do *not* accurately represent the "work experience of past incumbents in the job[.]" 29 C.F.R. § 1630.2(n)(3)(vi).

The bottom line is this: even if this Court were to disregard the survey results completely, the remaining relevant evidence is such that the Court easily concludes that there is no genuine issue with respect to the fact that physical fitness, as demonstrated by running, is an essential function of the Special Agent position.

2. <u>Mitchell Has Failed To Make A Sufficient Showing That She Could Perform The Physical Fitness Function Of The Special Agent Position</u>

The conclusion that physical fitness is an essential function of the Special Agent position for which State was training Mitchell leads inexorably to the question of whether Mitchell has shown that there is no genuine issue regarding whether she was "qualified" for the position insofar as she could perform *that* essential function of the job. In this regard it is important to note that, unlike more typical failure-to-accommodate cases, Mitchell did not fail to perform an essential function of her

position *while actually employed* in that position; instead, she failed a *test* that was supposed to determine whether she would be able to perform that essential function.

State contends that "the Bureau's timed 1.5-mile run requirement accurately measures the physical fitness requirements of the Special Agent position" (Def.'s Mem. at 18), and that Mitchell was not physically fit (the essential function) because she repeatedly failed to pass the run test (*see id.* at 19). Mitchell responds that "once a candidate becomes an agent, there are no standards for physical fitness, only suggestions and a mandate to participate in the physical fitness test, if possible" (Pl.'s Reply, ECF No. 67-4, at 9 (footnote omitted)), and that State "could have achieved the [physical fitness] information for Ms. Mitchell in other ways[,]" including, for example, "on a treadmill[] [or] on a stationary bike" (*id.* at 10). As demonstrated below, Mitchell's arguments are ultimately unavailing, because she does not, and cannot, refute State's evidence that the 1.5-mile-run test accurately measured candidates' ability to perform the physical fitness element of the Special Agent position, and even more important, she has offered no other evidence that she *could* in fact perform the essential functions of the Special Agent position, *i.e.*, that she was sufficiently physically fit. *See Dorchy v. Wash. Metro. Area Transit Auth.*, 45 F. Supp. 2d 5, 11 (D.D.C. 1999) ("[T]he employee has the burden of proving that he *can* perform the essential functions of his job." (emphasis in original)).

State offers undisputed evidence that the 1.5-mile-run test accurately measures the necessary physical fitness of Special Agent candidates. Dr. Victor Katch opined that "[c]ardio-respiratory fitness measured in men and women in the field using a timed 1.5-mile walk-run yields valid and reliable estimates of cardio-respiratory fitness" and

"when used carefully, the timed 1.5-mile walk-run can be used by itself to rank individual cardio-respiratory fitness." (Ex. 1 to Katch Decl. at 11; *see also id.* at 11–14 (providing facts and supporting materials for opinion).) More to the point, Dr. Katch also specifically stated that "[t]he timed 1.5-mile run, with minimum cut-points, represents both a reliable and valid measure of cardio-respiratory fitness for job performance screening for the Bureau of Diplomatic Security." (*Id.* at 14; *see also id.* at 15 (providing facts and supporting materials for opinion)). In addition, State has offered the expert opinion of Dr. Rick R. Jacobs, who linked the 1.5-mile run test to the daily responsibilities of a Special Agent by testifying both that "[t]he type of physical abilities test used by the U.S. Department of State Bureau of Diplomatic Security for Special Agent positions is consistent with physical abilities tests used in a multitude of settings for selecting personnel for law enforcement positions" (Ex. 1 to Jacobs Decl., ECF No. 58-6, at 6), and also that "[t]he standards used by the U.S. Department of State for the physical abilities test are reasonable and consistent with what is used in other law enforcement settings and the demands of the Bureau of Diplomatic Security special agent job" (*id.* at 11). Mitchell presents no evidence to rebut or otherwise undermine these expert opinions, and she makes no other arguments to refute State's assertion that its 1.5-mile-run test accurately and appropriately measures the requisite physical fitness of the Special Agent candidates.

Mitchell's argument that there were other—even *better*—ways to measure her physical fitness (*see, e.g.*, Pl.'s Reply at 10) is beside the point, because, regardless, Mitchell bears the burden of showing that she could perform the essential functions of the position, and she has not provided *any* evidence that would allow a reasonable fact-

finder to conclude that she has carried this burden. Nothing in the record establishes that Mitchell could have completed the run time with or without accommodation. (*See, e.g.*, Excerpts from Mitchell Dep., ECF No. 65-1, at 2 (answering "no" to "[h]ave you ever run the 1.5 miles in 16 minutes and 15 seconds while carrying your inhaler?" and "[h]ave you ever run the 1.5 miles in 16 minutes and [15] seconds?").) And Mitchell also fails to demonstrate that she could perform the physical fitness component of the Special Agent position, with or without accommodation, even if she could not pass the run test.

Without even attempting to make such a showing, Mitchell cannot create a genuine dispute as to this clearly material issue of fact. Therefore, this Court must conclude that no reasonable jury could find that Mitchell was able to perform the essential functions of the Special Agent position for which she was hired.

**B.     There Is A Genuine Dispute Of Fact As To Whether Mitchell Could Have Performed Another Position**

That Mitchell has failed to present sufficient evidence to show that she could perform the essential functions of the position for which she was hired does not end the inquiry, because "[a]n employee seeking reassignment to a vacant position is [] within the definition [of qualified] if, with or without reasonable accommodation, she can perform the essential functions of the employment position to which she seeks reassignment." *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1300–01 (D.C. Cir. 1998) (en banc); *see also* 42 U.S.C. § 12111(8) ("The term 'qualified individual' means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds *or desires*." (emphasis added)); *id.* § 12111(9)(B) (explaining that "'reasonable accommodation' may

include . . . reassignment to a vacant position"). "Indeed, when an accommodation cannot be made in the employee's current position, the federal employer *must* consider the feasibility of reassigning the disabled employee to a vacant position." *Harris v. Chao*, 257 F. Supp. 3d 67, 76 (D.D.C. 2017) (emphasis in original; internal quotation marks and citation omitted). In the litigation context, "[i]t is the plaintiff's duty to 'demonstrate that there existed some vacant position to which he [or she] could have been reassigned[,]'" *id.* at 77 (quoting *Aka*, 156 F.3d at 1304 n.27) (alteration in original); however, in real time and in real (pre-litigation) life, the employer has "a corresponding obligation to help [the employee] identify appropriate job vacancies[,]" *Aka*, 156 F.3d at 1304 n.27.

Consequently, this Court has assessed whether a genuine dispute presently exists regarding whether Mitchell could have performed the essential functions of another appropriate, vacant position within the State Department. (*See* Pl.'s Mem. at 20 (explaining that "Mitchell requested to be reassigned[] and never received a response").)

For the reasons set forth below, the Court has concluded that one does, because Mitchell has presented sufficient evidence to indicate that there was a possibility she could have performed another position, and State has not presented any evidence to show that there was no available position that Mitchell could have performed (presumably because State has erroneously relied on the belief that Mitchell failed to exhaust such an accommodation request and/or because it failed to engage in interactions with Mitchell regarding the possibility of reassignment prior to terminating her from the Special Agent program).

1.     <u>The Record Indicates That Mitchell May Have Been Qualified For</u>
          <u>A Different Position</u>

"A request as straightforward as asking for continued employment is a sufficient request for accommodation[,]" *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 694 (7th Cir. 1998), and Mitchell has presented sufficient evidence to show that she specifically sought reassignment to another position (*see, e.g.*, Ex. 4 to Klemm Decl., ECF No. 58-8, at 11 ("I hope that you will permit me to be an asset to the Department of State either as a [Diplomatic Security] agent or in some other capacity."); Ex. 7 to Pl.'s Cross-Mot. at 44 (email from Mitchell to Tracy Mahaffey explaining that she has been "placed with the DS/MGT/LS division" after being removed from Special Agent candidacy, and asking, "is it possible that I can remain in the position that I am in for 4-6 months?")).

Mitchell has also provided evidence that gives rise to a triable question of fact as to whether "a suitable vacancy existed at the time she sought transfer[,]" *Alston v. Wash. Metro. Area Transit Auth.*, 571 F. Supp. 2d 77, 82 (D.D.C. 2008) (internal quotation marks, citation, and alteration omitted). Specifically, Mitchell asserts that she "requested to be placed in a position that she held during interim relief" (Pl.'s Reply at 19), and she argues that she was qualified for that position, because "she was placed in [the] position during interim relief, and later hired as a third-party contractor to continue in that position," (*id.* at 14; *see also* Ex. 8 to Pl.'s Cross-Mot, ECF No. 60-2, at 2 (email from Acting Director General Hans Klemm to Mitchell, stating that "[a]s for your interest in working at DS Logistical Services Division, I am pleased to learn that DS/EX has offered you a third party contract position to work in their Logistics Services Division")).

Mitchell's evidence also supports the possibility that the alternative position she requested was available when she requested it. (*See* Ex. 7 to Pl.'s Cross-Mot. at 44 ("I noticed that the DS/MGT/LS division is hiring for the very position that I am currently working.").) It may also be the case that *other* available positions existed for which Mitchell was qualified, as Mitchell's briefs suggest. (*See, e.g.*, Ex. 1 to Pl.'s Cross-Mot. at 17–20 (describing Foreign Service Specialist positions); *id.* at 21–22 (describing Foreign Service Generalist positions).)

Thus, per the record before this Court, Mitchell has presented sufficient evidence to create a genuine issue of material fact as to whether another available position for which she was qualified existed at the time she requested reassignment.

 2. State Erroneously Relies On Exhaustion Principles And Has Not Presented Evidence Relating To Mitchell's Inability To Perform Another Available Position

State's argument for granting summary judgment in its favor rests entirely on the premise that "[t]he only accommodation that Ms. Mitchell administratively exhausted is her request to waive the 1.5-mile timed run requirement altogether." (Def.'s Mem. at 14.) State argues that Mitchell failed to exhaust any requests but the run waiver because she did not raise any other request in her administrative grievance filed with the Foreign Service Grievance Board, and that State is "entitled to summary judgment dismissing without prejudice Ms. Mitchell's reasonable accommodation claim to the extent it is based on these unexhausted accommodations." (*Id.* at 13 (citing *Barkley v. U.S. Marshals Serv. ex rel. Hylton*, 766 F.3d 25, 33 (D.C. Cir. 2014)).)

State's exhaustion argument is mistaken. Mitchell need not have raised "every detail of the eventual complaint" to have exhausted her failure-to-accommodate claim; rather, "the *substance* of [the] claim . . . must fall within the scope of 'the

administrative investigation that can reasonably be expected to follow the charge of discrimination.'" *Marshall v. Fed. Express Corp.*, 130 F.3d 1095, 1098 (D.C. Cir. 1997) (quoting *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995) (emphasis added)). And it is clear on the record before this Court that, regardless of which particular accommodations Mitchell did or did not explicitly raise in her administrative grievance, Mitchell plainly raised her failure-to-accommodate claim in her administrative filing. (*See* Ex. 1 to Shelton Decl. at 27–29 (seeking relief from separation and discussing the Rehabilitation Act's accommodation requirements).) With respect to administrative exhaustion, this is all that is required, and as a result, this Court can consider the full scope of Mitchell's failure-to-accommodate claim, including her contention that State failed to reassign her to another position for which she was qualified. *See, e.g.*, *Ware v. Hyatt Corp.*, No. 12-0395, 2013 WL 12321372, at *9 (D.D.C. Mar. 27, 2013) (concluding that although plaintiff had failed to identify disability in administrative filing, court could still consider plaintiff's failure-to-accommodate claim because the charge put defendant "on notice of the very failure to accommodate claim raised" in the lawsuit); *Lyles v. Dist. of Columbia*, 777 F. Supp. 2d 128, 136 (D.D.C. 2011) (concluding that plaintiff had exhausted failure-to-promote claim with regards to two particular positions even though administrative charge stated only that plaintiff "'ha[d] been denied promotions'").[5]

Because State focuses exclusively on Mitchell's request for a waiver of the run

---

[5] Even if State were correct and Mitchell had to raise particular accommodation requests in her administrative filing, the record shows that Mitchell *did* raise accommodations other than waiving the run requirement entirely. (*See, e.g.*, Ex. 1 to Shelton Decl. at 27 (stating, in the grievance filed with the Foreign Service Grievance Board, that "I hereby request interim relief from separation."); *id.* at 28 (explaining further that ADA requires accommodations including "altering when and/or how a function . . . is performed[,]" and arguing that State did not "[a]lter when and/or how the running requirement was performed").)

requirement in its motion (*see id.*), it spends less than four pages of its reply memorandum responding to Mitchell's "eight other accommodation[]" requests (Def.'s Reply at 13; *see also id.* at 13–16). Indeed, State's only response to Mitchell's argument that she could have performed a position other than that of Special Agent is that "Mitchell was ineligible by law to convert from a Foreign Service job to a civil service job." (Def.'s Reply at 15 (citing Excerpts from Shelton Dep., ECF No. 65-2, at 2–3 (166:6–167:18), 4–5 (177:9–178:15)).) State's declarant maintained that, "a foreign service employee can be converted to civil service if they are tenured[]" and "[o]utside of that, they have to apply to a vacancy announcement unless they have prior civilian or military service that makes them eligible for a noncompetitive appointment." (Excerpts from Shelton Dep. at 3 (167:13–18).) But this restatement of the purportedly applicable law, as well as the deponent's apparent "knowledge" that Mitchell was not tenured and did not have the requisite "prior civilian or military experience" (*id.* at 5 (178:3–7, 13–15)), does not prove that "Mitchell was ineligible by law" from performing the position she requested, or some other position that may have been available to her, as State asserts (Def.'s Reply at 15). Instead, it merely creates *a question of fact* as to whether Mitchell could have performed a position other than that of Special Agent. In this regard, Mitchell has offered evidence that, legal requirements or no, State *did* place her in a civil service position, for an interim period. And there appear to be numerous Foreign Service, rather than Civil Service, positions within State that may or may not have been available to someone in Mitchell's situation. (*See supra* n.4.) Thus, there thus exists a genuine dispute of material fact as to whether Mitchell was qualified for another position, and whether another position was available at the

time of her request.

3. State's Failure To Engage In An Interactive Process In Response To Mitchell's Request Is Indicative Of Bad Faith And Raises A Material Issue Of Fact Regarding State's Intent To Provide A Reasonable Accommodation

Notably, State might well have been in a position to proffer more information about Mitchell's factual or legal ability (or inability) to perform some other job within the agency if State had proceeded in good faith to engage in an interactive accommodations process once Mitchell failed the run test and requested an accommodation. *See Alston*, 571 F. Supp. 2d at 82 ("Once an employee has requested reassignment, the employer has a duty to engage in an interactive process with the employee to determine whether there is a job she can perform given her limitations."). While there is some evidence in the record that State engaged with Mitchell to some degree (*see, e.g.*, Ex. L to Pl.'s Opp'n to Def.'s Mot. to Dismiss, ECF No. 15-12, at 2 (letter from Mitchell indicating that she had met with someone from State and had scheduled another meeting "on the possibility of reviewing my candidacy as a Foreign Service Generalist")), it does not appear that State performed its duty of actually helping Mitchell to find another position, beyond just pointing her to job postings. *See Butler v. Wash. Metro. Area Transit Auth.*, 275 F. Supp. 3d 70, 85 (D.D.C. 2017) ("As a general matter, the employer has failed in its obligation to attempt to reassign an employee where an employee must on his own initiative apply for a job on the same basis as everyone else. Rather, the disabled employee must be given more assistance than other job applicants[.]" (internal quotation marks, citation, and alteration omitted)). (*See also, e.g.*, Ex. O to Pl.'s Opp'n to Def.'s Mot. to Dismiss, ECF No. 15-15, at 12–13 (emails showing that Mitchell sought to apply to a job posting and State's

tepid response).)

To be sure, it is by now well established that "[t]here is no independent cause of action for failure to engage in the interactive process[.]" *Doak v. Johnson*, 19 F. Supp. 3d 259, 278 n.20 (D.D.C. 2014). But it is also quite clear that the fact that State failed to participate in the interactive process once Mitchell had requested an accommodation "is prima facie evidence that the employer may be acting in bad faith[,]" *Cravens v. Blue Cross & Blue Shield of Kansas City*, 214 F.3d 1011, 1021 (8th Cir. 2000) (internal quotation marks and citation omitted), and thus, when the duty to engage in an interactive process has not been observed, "a factual question exists as to whether the employer has attempted to provide reasonable accommodation[,]" *id.* (internal quotation marks and citation omitted). And while it is true that Mitchell bears the burden of convincing a jury that a position for which she was qualified did in fact exist, "[n]either party should be able to cause a breakdown in the process for the purpose of either voiding or inflicting liability[,]" *Ward v. McDonald*, 762 F.3d 24, 32 (D.C. Cir. 2014) (quoting *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 805 (7th Cir. 2005)), and State is not entitled to judgment as a matter of law simply because it refused to participate in good faith in the interactive process with Mitchell. *Cf. Taylor v. Phoenixville School Dist.*, 184 F.3d 296, 315 (3d Cir. 1999) ("The interactive process would have little meaning if it was interpreted to allow employers, in the face of a request for accommodation, simply to sit back passively, offer nothing, and then, in post-termination litigation, try to knock down every specific accommodation as too burdensome."); *see also id.* at 317 ("In short, an employer who has received proper notice cannot escape its duty to engage in the interactive process simply because the

employee did not come forward with a reasonable accommodation that would prevail in litigation.").

At the end of the day, engaging in the "'flexible give-and-take' between employer and employee" that is characteristic of the interactive process promotes the purposes of the Rehabilitation Act because it permits an employee and employer, working together, to "'determine what accommodation would enable the employee to continue working.'" *Ward*, 762 F.3d at 32 (D.C. Cir. 2014) (quoting *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 805 (7th Cir. 2005)). At the very least and as relevant here, having engaged in such a process might have enabled State to produce sufficient evidence to show that other positions were considered but there was no other available position that Mitchell could have performed, such that summary judgment should be granted in its favor. The instant record is devoid of any such evidence and thus presents a genuine dispute of fact as to whether Mitchell was qualified to perform another available position. As such, this Court cannot grant summary judgment in either party's favor as to Mitchell's claim that State failed to accommodate her disability, as required by the Rehabilitation Act.

## IV. CONCLUSION

Mitchell has failed to present sufficient evidence to allow a reasonable fact-finder to conclude that she could have performed the essential functions of the Special Agent position. However, whether or not Mitchell could perform the essential functions of her interim position, or some other available position, is a genuine issue of fact that is plainly material to Mitchell's failure-to-accommodate claim. Accordingly, and as set forth in the accompanying Order, both Defendant's Motion for Summary

Judgment and Plaintiff's Cross-Motion for Summary Judgment must be **DENIED**.


DATE:  March 31, 2019                    *Ketanji Brown Jackson*
                                         KETANJI BROWN JACKSON
                                         United States District Judge